**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
BRIGHT BAY GMC TRUCK, INC.,

                                Plaintiff,

           -against-

GENERAL MOTORS CORPORATION,

                              Defendant.
-----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
08-CV-2857 (ADS)(ARL)

**APPEARANCES:**

**Myers & Fuller, PA**
Attorneys for the Plaintiff
2822 Remington Green Circle
Tallahassee, FL 32308
    By: Francis Xavier Tranior, Esq.
       Robert Byerts, Esq.
       Robert C. Spickard, Esq., Of Counsel

**John P. Finnerty**
Attorney for the Plaintiff
260 W. Main Street
Bayshore, NY 11706

**Jones Day**
Attorneys for the Defendant
325 John H. McConnell Blvd
Columbus, OH 43215
    By: James Todd Kennard, Esq.
       Jeffrey J. Jones, Esq.
       Dana Lynn Salazar, Esq., Of Counsel

**SPATT, District Judge**.

## I. BACKGROUND

The following facts are drawn from the complaint and the documents incorporated by reference therein. In 1990, Bright Bay GMC Truck, Inc. ("the Plaintiff") purchased a GMC dealership. GMC is the brand name used to market trucks, vans, and sports utility vehicles sold by General Motors ("GM or "the Defendant"). The Plaintiff alleges that when it purchased the dealership, GM represented that the Plaintiff would also eventually be able to acquire a Buick franchise at the same location. The parties agree that, in order to operate a GM franchise, a dealer must either be appointed by GM or acquire the franchise from an existing dealer.

In 1995, GM announced its "Channel Strategy," a business plan aimed at encouraging dealers to align the Buick, Pontiac, and GMC lines in one dealership facility. In response to GM's announcement of the Channel Strategy, the Plaintiff sought GM's assistance in purchasing a Pontiac franchise on Long Island. According to the Plaintiff, in August of 1999 GM's Northeast Regional Manager, Pete Gerosa, promised the Plaintiff that it would be "awarded" the next GM car franchise to become available on Long Island.

However, the Plaintiff alleges that when a franchise became available, GM "chose to discriminate against [the Plaintiff] in favor of another dealer, Frank

2

Bellavia." According to the Plaintiff, Frank Bellavia ("Bellavia") was the owner of Arnold Buick Pontiac of West Babylon and Arnold Chevrolet of West Babylon. The Plaintiff avers that Arnold Buick Pontiac was the closest Buick or Pontiac dealer to the Plaintiff's dealership and was therefore the most logical dealership for the Plaintiff to purchase if it wished to pursue the Channel Strategy.

The Plaintiff alleges that in June of 2007, GM's Michael LoBianco contacted the Plaintiff in an attempt to negotiate an agreement whereby the Plaintiff would acquire Bellavia's underperforming Buick and Pontiac dealerships. According to the Plaintiff, GM approved the Plaintiff's location for the Pontiac and Buick franchises and agreed to contribute $1 million towards the purchase. However, the Plaintiff avers that it was never able to acquire these dealerships because, in July of 2007, GM permitted Bellavia to relocate the Pontiac and Buick dealerships to his Chevrolet dealership location.

The Plaintiff alleges that, on or about June 4, 2007, GM confirmed its intention to eliminate any remaining stand alone GMC dealerships. Thereafter, the Plaintiff alleges that it made a number of unsuccessful attempts to purchase a Pontiac and/or Buick franchise. Having failed to acquire a GM car franchise, the Plaintiff commenced this lawsuit in July of 2008.

The Plaintiff alleges that, in announcing the Channel Strategy, GM rendered the Plaintiff's stand alone GMC dealership unprofitable and therefore breached the

3

parties' Sales and Service Agreement ("the Sales Agreement"), the Dealer Agreement, and the implied covenant of good faith and fair dealing.  The Plaintiff also alleges that GM breached the Sales Agreement and the implied covenant of good faith and fair dealing by consenting to the relocation of Bellavia's dealerships.  Finally, the Plaintiff alleges that GM's conduct constructively terminated the Plaintiff's GMC franchise in violation of several provisions of the New York Franchised Motor Vehicle Dealer Act ("FMVDA"), N.Y. VEH. & TRAF. Law §§ 463(2)(d)(1), 463(2)(b).  On September 15, 2008, the Defendant filed the instant Fed. R. Civ. P. 12(b)(6) motion to dismiss all six counts in the complaint.

## II.  DISCUSSION

**A**.     **Standard - 12(b)(6) Motion to Dismiss**

In considering a 12(b)(6) motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  <u>Todd v. Exxon Corp.</u>, 275 F.3d 191, 198 (2d Cir. 2001) (quoting <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).  In this regard, the Court must "accept all of the plaintiff's factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to the plaintiff."  <u>Starr v. Georgeson S'holder, Inc.</u>, 412 F.3d 103, 109 (2d Cir. 2005).

A complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face."  <u>Bell Atl. Corp. v.</u>

Twombly, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). The Second Circuit has interpreted Twombly to require that a complaint "allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion." Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d 117, 121 (2d Cir. 2007). On a 12(b)(6) motion to dismiss, the Court must limits its "consideration to facts stated in the complaint or documents attached to the complaint as exhibits or incorporated by reference." Nechis v. Oxford Health Plans Inc., 421 F.3d 96, 100 (2d Cir. 2005).

B.     **The Defendant's Motion to Dismiss**

    1. **Count I - Violation of FMVDA § 463(2)(d)(1)**

Section 463(2)(d)(1) of FMVDA provides that **"**[i]t shall be unlawful for any franchisor, notwithstanding the terms of any franchise contract [t]o terminate, cancel or refuse to renew the franchise of any franchised motor vehicle dealer except for due cause, regardless of the terms of the franchise." Here, the Plaintiff appears to argue that GM's announcement of the Channel Strategy and GM's alleged refusal to give the Plaintiff or help the Plaintiff acquire a GM car dealership effectively terminated its "stand alone" GMC franchise. The Defendant counters that there has been no termination here because the Plaintiff continues to operate a GMC franchise. The Court agrees.

The Plaintiff relies heavily upon Robert Basil Motors, Inc. v. General Motors Corp., 2004 WL 1125164 (W.D.N.Y. Apr. 17, 2004) and a line of similar cases to support its argument. See Arthur Glick Truck Sales, Inc. v. General Motors, 865 F.2d 494 (2d Cir.1989); Crest Cadillac Oldsmobile, Inc. v. General Motors Corp., 2005 WL 3591871 (N.D.N.Y. Dec. 30, 2005). However, even a cursory reading of these cases reveals that the Plaintiff's reliance is misplaced.

In Glick, the plaintiff owned a GMC franchise where he sold light-, medium-, and heavy-duty trucks. 865 F.2d at 495. When GM notified the plaintiff that it would no longer offer heavy-duty trucks for sale in North America, the plaintiff commenced a lawsuit alleging that GM's discontinuance of the heavy-duty line constituted a termination of its franchise within the meaning of Section 463(2)(d)(1). Id. at 496. The district granted summary judgment in favor of the defendant but the Second Circuit reversed finding that there was a genuine issue as to whether the plaintiff's heavy-duty truck line was a separate franchise that had been terminated when GM discontinued the sale of such trucks. Id. at 497. In reaching that conclusion, the Second Circuit rejected GM's argument that there was no termination because the plaintiff was still able to sell light-duty and medium-duty trucks. Id.

In Robert Basil and Crest, the plaintiffs, two Oldsmobile dealerships, argued that GM's decision to phase-out the Oldsmobile line amounted to a constructive termination of their franchises in violation of Section 463(2)(d)(1). Crest, 2005 WL

3591871, at *2; Robert Basil, 2004 WL 1125164, at *2. In Robert Basil, GM countered, as it does here, that there had been no termination because the plaintiffs continued to operate their Oldsmobile dealerships at the time their claims were filed. Robert Basil, 2004 WL 1125164, at *2. However, in both of these cases, courts found that the plaintiffs' claims under 463(2)(d)(1) could survive a motion to dismiss because GM had *completely discontinued* manufacturing the line of cars sold by the plaintiffs' dealerships. Crest, 2005 WL 3591871, at *2; Robert Basil, 2004 WL 1125164, at *3.

Plainly, these cases are inapposite. GM has not discontinued the sale of GMC trucks. The Plaintiff currently sells GMC vehicles at its dealership and, by all accounts, may continue to do so until the parties' Sales Agreement expires in October of 2010. In announcing the Channel Strategy, GM merely *encouraged* dealers to align the Buick, Pontiac, and GMC lines in one dealership facility. The fact that GM has not given the Plaintiff a Pontiac or Buick franchise or assisted it in purchasing one, does not mean that GM has terminated the Plaintiff's GMC franchise. Accordingly, Count I of the Plaintiff's complaint must be dismissed.

**2. Count II - Violation of FMVDA § 463(2)(b)**

Section 463(2)(b) of FMVDA prohibits franchisors from coercing or attempting to coerce a "dealer to enter into an agreement or [to] act in a manner contrary to its economic interests by threatening to cancel an unexpired contractual

agreement." See Action Nissan, Inc. v. Nissan North America, 454 F. Supp. 2d 108, 119 (S.D.N.Y. 2006) (citing § 463(2)(b)). In interpreting whether a franchisor has engaged in or attempted to engage in coercion within the meaning of Section 463(2)(b), courts in the Second Circuit have borrowed the standard used to analyze the Automobile Dealer's Day in Court Act ("ADDCA"), a virtually identical federal statute. Action Nissan, 454 F. Supp. 2d at 119-120 (S.D.N.Y. 2006) (citing Subaru Distrib. Corp. v. Subaru of America, Inc., 2002 WL 413808, at *12 (S.D.N.Y. Mar.18, 2002)). Under both the ADDCA and the FMVDA, the alleged "[c]oercion or intimidation must include a wrongful demand which will result in sanctions if not complied with." General Motors Corp. v. Villa Marin Chevrolet, Inc., 2000 WL 271965, at *21 (E.D.N.Y. Mar. 7, 2000).

Here, the Plaintiff does not contend that GM made any wrongful demands. Indeed, the complaint is devoid of allegations that GM made *any* demand. To the extent that the Plaintiff argues that the Channel Strategy was coercive, this argument is undermined by the Plaintiff's own admission that the Channel Strategy was purely voluntary. The complaint simply does not include any allegations that GM intimidated the Plaintiff into any course of action by threatening to cancel the parties' agreements. Accordingly, Count II must be dismissed.

### 3. Counts III and IV - Breach of the GM Sales and Service Agreement

The Sales agreement between the parties, which was entered into on November 1, 2005, is set to expire in October of 2010. In general, the Sales Agreement gives the Plaintiff the right to represent itself as a GM dealer and to sell or service GMC vehicles. Although the Plaintiff's complaint is not a model of clarity in setting forth the contract provision(s) upon which it relies for each respective count, it appears that there are two provisions of the Sales Agreement that are relevant to the instant motion.

Article 6.4.1 states that the "[d]ealer agrees to purchase and stock and General Motors agrees to make available, subject to Article 6.1, a mix of models and series of Motor Vehicles . . . in quantities adequate to enable Dealer to fulfill its obligations in its Area of Primary Responsibility." Under Article 6.1, GM "reserves to itself discretion in accepting orders and distributing Motor Vehicles, and its judgments and decisions are final." In Count III, it seems the Plaintiff's argument is that, because the Plaintiff has been unable to acquire a Pontiac or Buick dealership, GM's Channel Strategy has left the Plaintiff's GMC dealership without an adequate mix of vehicles to sell. This argument is without merit.

Unlike the complaint in Robert Basil, there is no allegation here that the franchisor completely discontinued the line of cars being sold by the Plaintiff. Apparently, the Plaintiff believes that, in light of the *optional* Channel Strategy, 6.4.1 *requires* GM to give the Plaintiff or help the Plaintiff acquire a Pontiac or Buick

9

dealership. However, the plain and unambiguous language of 6.4.1 requires GM to do nothing more than offer the Plaintiff a supply of GMC trucks that is sufficient to meet the demand in the Plaintiff's market. Here, there is no allegation that GM has failed to ship a sufficient number of GMC trucks to the Plaintiff's dealership. Accordingly, Count III must be dismissed.

Article 4.1 of the Sales Agreement, entitled "Dealer Network Planning," provides in pertinent part that:

> [b]ecause General Motors distributes its Products through a network of authorized dealers operating from approved locations, those dealers must be appropriate in number, located properly, and have proper facilities to represent and service General Motors Products competitively and to permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligation under its Dealer Agreement.

In Count IV, the Plaintiff appears to contend that GM breached Article 4.1 of the Sales Agreement by allowing Bellavia to relocate his Pontiac and Buick dealerships to his Chevrolet location. In particular, the Plaintiff argues that, in doing so, GM breached its contractual obligation to: (i) maintain a network of authorized dealers operating from approved locations; and (ii) provide each dealer with an opportunity to achieve a reasonable return on their investment in a GM franchise.

The Court fails to perceive, and the Plaintiff makes no effort to explain, how GM could possibly have breached Article 4.1 by allowing Bellavia to relocate his Buick and Pontiac dealerships. The Court is not willing to find, as the Defendant

urges it should, that the language in Article 4.1 is purely aspirational in that it gives rise to no affirmative obligations. Article 4.1 does impose some obligation on the part of GM to ensure that a franchisee is able to obtain a reasonable return on its investment. See Robert Basil, 2004 WL 1125164, at *6 (finding that Article 4.1 does impose some obligation "upon GM in planning its dealer network to permit [the franchisee] to achieve a reasonable return on its investment."). However, it is evident that GM's tacit approval of Bellavia's relocation has not improperly interfered with the Plaintiff's opportunity to achieve a reasonable return on its investment in a GMC franchise.

In this sense, the facts are distinguishable from General Motors Corp. v. Dealmaker, LLC, 2007 WL 2454208 (N.D.N.Y. Aug. 23, 2007), the case principally relied upon by the Plaintiff. In Dealmaker, GM sought a declaratory judgment that it was within its contractual rights under Article 4.1 to deny a franchisee's proposed relocation request. Id. at *1. The franchisee argued that GM's refusal to honor its relocation request constituted a breach of Article 4.1 because, among other things, the franchisee was unable to obtain a reasonable return on its investment at its current location. Id. at *8. Although the Court expressed doubt about the merits of the franchisee's breach of contract claim, it nonetheless found that the franchisee had set forth sufficient allegations to survive a motion to dismiss. Id. The facts at bar are quite different and far less compelling.

Article 4.1 does not extend so far as to impose upon GM an obligation to give the Plaintiff or help the Plaintiff acquire a GM franchise. The Court is unwilling to read Article 4.1 to require GM to compel Bellavia to sell one of his dealerships to the Plaintiff so that the Plaintiff's GMC franchise could remain profitable. Accordingly, Count IV must be dismissed.

### 4. Count V - Breach of the GM Dealer Agreement

The parties' relationship is also governed by the Dealer Agreement which, according to the Plaintiff, memorialized the Defendant's promise to "permit each dealer the opportunity to achieve a reasonable return on investment if it fulfills its obligation under its [Sales Agreement]." Although Count V is predicated upon a provision in the Dealer Agreement, it is merely duplicative of Count IV and suffers from the same infirmity. Namely, that this language does not impose upon GM any obligation to assist the Plaintiff in acquiring a GM car franchise in order to remain profitable. Accordingly, Count V must be dismissed.

### 5. Count VI - The Implied Covenant of Good Faith and Fair Dealing

The parties agree that Michigan law governs the disposition of the Plaintiff's claim for a breach of the implied covenant of good faith and fair dealing. However, it is settled law that Michigan courts do not recognize the implied covenant of good faith and fair dealing. See Fodale v. Waste Mgmt. of Michigan, Inc., 718 N.W.2d 827, 841

(2006) (citing Belle Isle Grill Corp. v. City of Detroit, 666 N.W.2d 271, 279 (2003)).

Accordingly, Count VI must be dismissed.

### III.  CONCLUSION

Based on the foregoing, it is hereby

**ORDERED,** that the Defendant's motion to dismiss all six counts of the complaint is **GRANTED**, and it is further

**ORDERED**, that the clerk of the Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York

      January 20, 2009


                                      */s/ Arthur D. Spatt*
                                      ARTHUR D. SPATT
                                  United States District Judge